Filed 4/1/14  P. v. Rector CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JEFFREY ALLEN RECTOR,<br><br>    Defendant and Appellant. | F064902<br><br>(Super. Ct. No. BF136638B)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [CHANGE IN JUDGMENT]** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADRIAN LYONS,<br><br>    Defendant and Appellant. | F065064<br><br>(Super. Ct. No. BF136638A) |

**THE COURT:**

It is ordered that the opinion filed herein on March 19, 2014, be modified in the following particulars:

On page 28, the paragraph and footnote under the heading **DISPOSITION** are deleted and the following paragraphs and footnote are inserted:

The jury's finding that the crime was committed in violation of section 186.22, subdivision (b)(1), as alleged in count 1 (attempted murder), count 2 (aggravated mayhem), and count 3 (attempted second degree robbery), is vacated.

Rector's conviction for active participation in a criminal street gang, as alleged in count 4, and for carrying a loaded firearm in public while a member of a criminal street gang, as alleged in count 6, is reversed.

The jury's finding that Lyons violated section 12022.53, subdivisions (d) and (e)(1) is vacated.

The judgment is otherwise affirmed. The matter is remanded to the trial court for resentencing of Rector and Lyons and to prepare new abstracts of judgment.[8]

This modification changes the judgment.

Respondent Jeffrey Allen Rector's petition for rehearing is denied.

_____
CORNELL, J.

WE CONCUR:

_____
HILL, P.J.

_____
LEVY, J.

---

[8]We also note the abstracts of judgment for Rector and Lyons incorrectly state defendants were convicted of first degree robbery. The jury found each defendant guilty of attempted second degree robbery. This error also should be corrected in the trial court.

2.

Filed 3/19/14  P. v. Rector CA5 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JEFFREY ALLEN RECTOR,<br><br>     Defendant and Appellant. | F064902<br><br>(Super. Ct. No. BF136638B)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ADRIAN LYONS,<br><br>     Defendant and Appellant. | F065064<br><br>(Super. Ct. No. BF136638A) |

APPEALS from judgments of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Jeffrey Allen Rector.

Michael P. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Adrian Lyons.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In this consolidated appeal, a jury convicted Jeffrey Allen Rector and Adrian Lyons (collectively, defendants) of various crimes related to an attempted armed robbery of a taxi cab driver who was shot twice. The prosecution also alleged each defendant was an active participant in a criminal street gang (Pen. Code, § 186.22, subd. (a)),[1] and that the crime was committed for the benefit of a criminal street gang (*id.,* subd. (b)(1)).

The issues in this case primarily involve the criminal street gang findings. Defendants assert there was insufficient evidence that (1) the crime was committed for the benefit of a criminal street gang, and (2) one of the identified gangs met the statutory requirements of a criminal street gang. We find merit to both arguments, requiring reversal of (1) the gang enhancement for both defendants, (2) a gun use enhancement for Lyons, and (3) the gang participation conviction for Rector.

We will vacate the relevant findings, otherwise affirm the judgment, and remand the matter to the trial court for the resentencing of Lyons and the preparation of a new abstract of judgment for both defendants.

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

## FACTUAL AND PROCEDURAL SUMMARY

### The Information

Defendants each were charged with attempted first degree murder (§§ 664, 187, subd. (a), 189), aggravated mayhem (§ 205), attempted armed robbery (§§ 664, 212.5, subd. (a)), active participation in a criminal street gang (§ 186.22, subd. (a)), possession of a firearm by a felon (former § 12021, subd. (a)(1)), and possession of a loaded firearm in public by a member of a criminal street gang (former § 12031, subd. (a)(2)(C)).

The following enhancements and prior convictions were alleged against Rector, some of which were not applicable to every count: (1) personal infliction of great bodily injury (§ 12022.7), (2) commission of the crime for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), (3) personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)), (4) being a principal in a crime during which another principal personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)), and (5) one prior prison term enhancement (§ 667.5, subd. (b)).

The following enhancements and prior convictions were alleged against Lyons, some of which were not applicable to every count: (1) personal infliction of great bodily injury (§ 12022.7), (2) commission of the crime for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), (3) being a principal in a crime during which another principal personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)), and (4) three prior prison term enhancements (§ 667.5, subd. (b)).[2]

---

[2]The information also alleged in counts 1, 2 and 3 that Lyons personally discharged a firearm resulting in great bodily injury. This enhancement was dismissed by the prosecution.

### Testimony Regarding the Shooting

Genaro Alvarado Zamora was a self-employed taxi driver. On the night in question he was at a casino when two men (Rector and Lyons) asked for a ride. Zamora ended his card game and met the two men outside. The two men got into the rear seat of the taxi and Rector directed Zamora to drive them to a nearby intersection.[3] When Rector directed Zamora to drive down an alley, Zamora refused and stopped on the street. Rector asked what the fare was, and Zamora said it was five dollars. Rector refused to pay the fare and instead demanded Zamora's money. Zamora refused to give him any money. Rector and Lyons kept talking and finally Lyons told Zamora to get out of the vehicle. Zamora feared for his life, but he got out of the car. Rector pulled out a gun and shot Zamora twice. Zamora stated on further examination that he could not remember exactly who had shot him, but he thought it was Rector.

After he was shot, Zamora got back inside the vehicle, picked up his telephone, and called emergency services. Zamora heard the gun dry firing, so he drove away.

Bakersfield Police Officer Chris Ward responded to the scene of the taxicab and observed what appeared to be two gunshot wounds on the victim, one in the neck and the other in the face. Ward also located a black head wrap approximately 100 to 150 feet from the taxicab. The parties stipulated the head wrap belonged to Lyons and it was in his possession on the night of the shooting.

### Expert Testimony

Kerry Tripp was a detective for the City of Inglewood Police Department assigned to the gang intelligence unit. His position required him to monitor all criminal street gangs and members. He also determined which gangs had a rivalry, which gangs may

---

[3]Zamora did not identify either defendant by name, but other testimony established to which defendant Zamora was referring. We identify defendants by name to ease the reader's task.

have committed a crime, and reviewed reports of crimes to determine if there was a gang connection.

Neighborhood Piru is a criminal street gang in the City of Inglewood affiliated with other Blood criminal street gangs. There are approximately 20 different criminal street gangs in the City of Inglewood that affiliate with the Bloods criminal street gang. Generally, the Neighborhood Piru criminal street gang is a rival to any Crips criminal street gang. The lone exception involves the Inglewood Family Bloods, who have formed a truce with the Hoover Crips and the Eight-Tre (or 83) Crips. Because of this alliance, the other Blood gangs in the city (including Neighborhood Piru) have a quasi-truce with these Crips gangs.

Tripp had had several conversations with Rector. In one conversation Rector admitted being a member of the Neighborhood Piru criminal street gang. Based on this admission, Rector's gang tattoos, his association with other members of the gang, and his regular presence in gang territory, Tripp opined that Rector was a member of the Neighborhood Piru criminal street gang.

Tripp also testified about the Hoover Criminals (or Hoover Crips) criminal street gang. This is a very large gang in Los Angeles affiliated with other Crips criminal street gangs. Tripp occasionally had contacted Neighborhood Piru criminal street gang members who had been in the presence of Hoover Criminals gang members. Tripp explained that even though Bloods and Crips normally are rivals, they sometimes maintain friendships with relatives or others who are in different gangs. Tripp was not aware of any alliance between the Neighborhood Piru and the Hoover Criminals criminal street gangs.

Travis Harless was assigned to the gang unit of the Bakersfield Police Department and had testified as an expert in only three other cases, all involving criminal street gangs in Kern County.

Harless had had five to 10 contacts with members of the Hoover Criminals criminal street gang in Kern County. The Hoover Criminals criminal street gang originated in Los Angeles, as did all of the African-American gangs in Bakersfield. Harless had spoken to one gang member who stated that the Hoover Criminals have "kind of a loose alliance between the two gangs," apparently referring to the Bloods. Harless also had traveled to Los Angeles where he spoke with two members of the Neighborhood Crips. During this contact he was told that the Hoover Criminals, Bloods, and a third gang known as the Eight-Tre Gangsters have a three-gang alliance to fight the Neighborhood Crips.

Harless testified about several predicate crimes of the Hoover Criminals criminal street gang. The first involved Willie Brown, Willie Payne and Dupree Demery. The three were found in possession of a large amount of cocaine base and marijuana on August 22, 2009. Brown was convicted of possession of cocaine base for sale, which is one of the primary activities of the Hoover Criminals and the Bloods. The second crime occurred on September 8, 2007, and again involved Brown. Brown and some other individuals climbed over a fence and stole marijuana plants. Brown was convicted of grand theft. Brown committed this crime with some members of the Bloods criminal street gang. A third crime occurred on February 28, 2009, in Los Angeles County. Based on his conversations with other officers, Harless testified that Demageo Hall, a member of the Hoover Criminals criminal street gang, shot two victims, killing one of them, because he thought they were members of a rival gang. Hall was convicted of murder, attempted murder, as well as gang and firearm enhancements. A fourth crime occurred on July 2, 2009, in Los Angeles County. Darren Trotter, a member of the Hoover Criminals criminal street gang, was charged with shooting an individual he believed was a rival gang member. He was found guilty of assault with a deadly weapon, as well as gang enhancements.

Harless identified some of Lyons's tattoos as being consistent with those of other members of the Hoover Criminals criminal street gang and as indicating membership in the Hoover Criminals street gang. Two field identification cards from Los Angeles indicated that Lyons admitted being a member of the 94 Hoover Criminals criminal street gang in 2007 and 2009. Harless also reviewed a booking report from 2007 wherein Lyons admitted membership in the Bloods gang.

Based on this information, Harless opined that Lyons was an active member of the Hoover Criminals criminal street gang.

Based on Tripp's testimony and his one conversation with members of the Neighborhood Crips criminal street gang, Harless responded to a hypothetical question that posited the following facts: (1) a crime of attempted robbery that ended with the victim being shot was committed in Bakersfield, and (2) the crime was committed by a gang member from Los Angeles that was a member of the Bloods criminal street gang, along with a gang member from Los Angeles that was a member of the Hoover Criminals criminal street gang. The prosecutor then asked if the crime was committed for the benefit of, at the direction of, or in association with either the Hoover Criminals or Bloods criminal street gangs.

Harless opined the crime would benefit and be in association with both the Hoover Criminals and Bloods criminal street gangs because "they have this alliance that allows them to commit these crimes together. The robbery is one of the primary activities of both gangs. [¶] Also committing a shooting or any act of violence is very common within gang culture. Violence itself is used for a number of things for gang members. It's used for not just offensive or defensive purposes. It's used to acquire money; it's used as a form of communication; and it's used as a way to resolve problems. So by -- also, I'm sorry, it's also used to gain respect within gang culture. [¶] So by committing a robbery or an attempt[ed] robbery, I think it's benefiting both gang members because they're going to benefit financially and also benefit their gangs. And also by committing

7.

this shooting it's beneficial to the gangs because it bolsters their status as gang members and it solidifies that alliance between these two gangs."

When asked how the two gang members were associating, Harless replied, "The two gang members are from these rival -- or I'm sorry, they're from allied gangs. The two of them are associating together as they're committing a crime and the association is that they are actively committing a crime together."

Harless admitted that the Hoover Criminals criminal street gang, to which Lyons belonged (94 Hoover Criminals), was located in Los Angeles. Harless admitted neither the victim nor any of the casino employees who testified suggested either suspect was involved in a gang.

When asked to explain the Blood gangs in Los Angeles, Harless stated that the term "Blood" is a generic term used to describe a large number of different gangs. Harless admitted that Tripp had a different perspective on Blood gangs than he did because in Inglewood, where Tripp worked, there are 18 different Blood gangs. Harless also admitted he was unaware of any single person or group that controls all of the Blood gangs in Southern California, i.e., those gangs operate independently of each other.

Harlan Hunter testified as a defense expert on criminal street gangs. He agreed that Rector was a gang member. In response to a hypothetical question, he opined this crime was not committed for the benefit of a criminal street gang. He observed there was no evidence that the Los Angeles gangs would benefit in any way from this crime. He also noted that the different criminal street gangs in Los Angeles that share the Hoover Criminals name are independent gangs that do not take direction from any individual or central governing body. He also confirmed there was not an alliance between the 94 Hoover Criminals and the Neighborhood Piru criminal street gangs.

### The Verdict and Sentencing

The jury found Lyons guilty of (1) attempted second degree murder, (2) aggravated mayhem, (3) attempted second degree robbery, and (4) participation in a

8.

criminal street gang. In addition, on counts 1 through 3, the jury found true allegations that (1) the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), and (2) Lyons was a principal in the offense and at least one principal intentionally discharged a firearm proximately causing great bodily injury within the meaning of section 12022.53, subdivisions (d) and (e)(1).[4] In a bifurcated trial, the trial court found Lyons had served three prior prison terms pursuant to the provisions of section 667.5, subdivision (d).

The trial court sentenced Lyons to an aggravated term of nine years for the attempted murder, enhanced by a term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1), and three one-year terms pursuant to section 667.5, subdivision (b), for a total determinate term of 12 years and an indeterminate term of 25 years to life. The sentences on the remaining counts and enhancements were stayed pursuant to section 654.

The jury found Rector guilty of (1) attempted first degree murder, (2) aggravated mayhem, (3) attempted second degree robbery, (4) participation in a criminal street gang, (5) possession of a firearm by a felon, and (6) carrying a loaded firearm while a member of a criminal street gang. The relevant allegations found true by the jury were (1) the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), and (2) Rector personally discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivision (d).

---

[4]The jury also found true an allegation that the crimes were serious felonies within the meaning of section 1192.7, subdivision (c)(28). We find this allegation curious because section 1192.7 defines those crimes that are serious felonies, which appears to operate as a matter of law and does not require a jury finding. Moreover, our review of the jury instructions did not locate any instruction that would define a serious felony to the jury or guide it in making this determination. Accordingly, this finding appears to be superfluous.

The trial court sentenced Rector to an indeterminate term of 15 years to life for attempted murder, enhanced by an indeterminate term of 25 years to life for the section 12022.53, subdivision (d) enhancement, for a total indeterminate term of 40 years to life. The sentences on the remaining counts and enhancements were stayed pursuant to the provisions of section 654.

**DISCUSSION**

Lyons and Rector raise numerous arguments, and each joins the arguments made by the other. Defendants' primary focus is on the evidence related to the criminal street gangs and the jury's findings related to the gang enhancements. We will address the criminal street gang evidence first and then the remaining contentions.

## I.     Criminal Street Gang Arguments

Defendants assert there was insufficient evidence to support the finding that the crime was committed for the benefit of a criminal street gang. Rector also claims there was insufficient evidence the gang to which he allegedly belonged (Neighborhood Piru) was a criminal street gang within the meaning of section 186.22.

### *Standard of Review*

Our review of the sufficiency of the evidence is deferential. We "'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496; *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681.) We focus on the whole record, not isolated bits of evidence. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203.) We presume the existence of every fact the trier of fact reasonably could deduce from the evidence that supports the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We will not substitute our evaluations of a witness's credibility for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)

10.

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

Circumstantial evidence does not directly prove a fact. But, if the circumstantial evidence is believed, the jury may infer the truth of the fact in question. (CALCRIM No. 223.) But a reasonable inference may not be based on conjecture or guesswork. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416-1417.) Black's Law Dictionary defines an inference as "A conclusion reached by considering other facts and deducing a *logical consequence* from them." (Black's Law Dict. (9th ed. 2009) p. 847, col. 2, italics added.) "The strength of an inference may vary widely. In some circumstances, the preliminary facts may virtually compel the conclusion. In other circumstances, the preliminary facts may minimally support the conclusion. But to constitute an inference, the conclusion must to some degree reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference. [Citations.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) In other words, factual findings must be based on inferences drawn from evidence, not speculation as to probabilities or possibilities. (*Sifuentes,* at pp. 1416-1417.)

11.

Furthermore, substantial evidence is not the same as any evidence, or a mere scintilla of evidence. (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 614 (*Alexander L.*).) To be substantial, the evidence must be reasonable, credible, and of such solid value that a reasonable trier of fact could find a defendant guilty beyond a reasonable doubt. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

### Commission of the Crime for the Benefit of a Criminal Street Gang

The jury found the crime was committed for the benefit of a criminal street gang pursuant to the provisions of section 186.22, subdivision (b). This section provides for enhanced punishment for any felony that is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members …." To find the enhancement true, the jury must find (1) the crime was committed for the benefit of any criminal street gang, or at the direction of any criminal street gang, or in association with any criminal street gang, and (2) the crime was committed with the specific intent to promote the criminal street gang, or further any criminal street gang, or assist any criminal conduct by gang members.

The issue here is the first element -- whether the crime was committed for the benefit of any criminal street gang, or at the direction of any criminal street gang, or in association with any criminal street gang. The prosecution theorized the crime was committed for the benefit of a criminal street gang or in association with any criminal street gang, eschewing the theory the crime was committed at the direction of a criminal street gang. Lyons and Rector argue the testimony on this issue was insufficient to prove the first element of the enhancement, regardless of the theory relied on by the People.

The prosecution relied on the testimony of Harless and Tripp to support its theory. To analyze this testimony, it is necessary to review basic tenets governing expert testimony. Well-established law in California permits an expert to offer an opinion only if (1) the opinion is "Related to a subject that is sufficiently beyond common experience

12.

that the opinion of an expert would assist the trier of fact," and (2) the opinion is "Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates .…" (Evid. Code, § 801.)  Such testimony is permitted because the law favors the admission of evidence that makes comprehensible and logical that which is otherwise inexplicable and incredible.  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.)

"Expert testimony may also be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions.  [Citations.]  Of course, any material that forms the basis of an expert's opinion testimony must be reliable.  [Citation.]  For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion.  Like a house built on sand, the expert's opinion is no better than the facts on which it is based.'  [Citation.]"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).)

Not only is an expert witness limited to testifying to subjects beyond common experience, the law places other limits on expert testimony.  Experts may not testify to legal conclusions.  (*People v. Jones* (2013) 57 Cal.4th 899, 950.)  Nor may he or she base an opinion on surmise, guesses, or conjecture.  (*Id*. at p. 951; *People v. Vang* (2011) 52 Cal.4th 1038, 1046.)  Expert testimony that rests on assumptions, conjecture, and speculation "has little or no probative value, bears the potential to mislead the jury into accepting the unsupported assumption and drawing from it unwarranted conclusions, and thus cannot significantly 'help the trier of fact evaluate the issues it must decide.' [Citation.]"  (*People v. Moore* (2011) 51 Cal.4th 386, 406.)  "That an event *could* have happened … does not by itself support a deduction or inference it did happen.…  Jurors should not be invited to build narrative theories of a … crime on speculation."  (*Ibid*.)

13.

Accordingly, expert testimony based on surmise or conjecture is without foundation and is not substantial evidence. (*Alexander L., supra,* 149 Cal.App.4th. at pp. 612-613.) Similarly, expert testimony which is conclusionary is not substantial evidence. (*Id*. at p. 612.)

We now apply these principles to the testimony of Tripp and Harless. Tripp, an experienced detective (26 years as a peace officer) and gang investigator (11 years) with the City of Inglewood Police Department, testified the Neighborhood Piru criminal street gang is affiliated with other Blood criminal street gangs. Typically, Bloods and Crips are rivals, and the Neighborhood Piru criminal street gang is a rival to any Crips criminal street gang. The one exception of which Tripp was aware involved the Inglewood Family Bloods criminal street gang. This gang formed a truce or alliance with the Hoover Criminals (or Crips) and the Eight-Tre Gangster Crips criminal street gangs in an effort to fight the Neighborhood Crips criminal street gang, which is a huge criminal street gang in the area.

Tripp did not know of any alliance between the Neighborhood Piru criminal street gang and the Hoover Criminals criminal street gang or the 94 Hoover Criminals criminal street gang. Tripp did not testify about the elements of the section 186.22, subdivision (b) enhancement.

The only testimony supporting the section 186.22, subdivision (b) enhancement was provided by Harless. We begin by noting Harless's minimal qualifications. He had been a peace officer for four years and with the gang unit only two years. He had the requisite training to qualify as an expert witness on Bakersfield gangs, but his experience with Los Angeles gangs was nonexistent.

Harless had had five to 10 contacts with members of the Hoover Criminals criminal street gang in the Bakersfield area. According to one source, the Hoover Criminals gang members in Bakersfield had a loose alliance with the Bloods in Bakersfield. He also made one trip to Los Angeles approximately three months before

14.

the trial.  He had a short meeting with Tripp and then went on patrol with other gang officers and made two contacts with "gang members … in Inglewood and the area surrounding Inglewood," including one Bloods member but no members of the Hoover Criminals criminal street gang.  He also spoke with two members of the Neighborhood Crips, which he described as the primary rival of the Hoover Criminals street gang and the Bloods.  These gang members confirmed a three-gang alliance between the Eight-Tre Gangster Crips, Hoover Criminals, and the Bloods to fight against the Neighborhood Crips.

Harless's description of an alliance between the Hoover Criminals and Bloods is an exaggeration.  Our conclusion is based on two facts to which both Harless and Tripp testified.  First, the term "Blood" is a generic term that refers to a large number of different gangs, and not to a specific gang.  Similarly, the Hoover Criminals criminal street gang is a very large gang with numerous subsets.  While the alliance to which Tripp testified involved three very specific gangs, the alliance to which Harless testified was so general as to be meaningless.

We also point out that it is necessary to examine Harless's testimony closely to avoid confusion and unfounded generalizations.  He testified to a meeting in Inglewood involving a member of the Neighborhood Crips and being told of an alliance between the Hoover Criminals, Bloods, and Eight-Tre Gangster Crips criminal street gangs.  This would appear to be a rather large alliance; but, upon further questioning, Harless referred to the alliance by the same phrase ("Movin,' Groovin,' and Sowoopin'") used by Tripp when referring to a specific alliance between the Inglewood Family Bloods, Hoover Criminals, and the Eight-Tre Gangster Crips.  Accordingly, it is clear the alliance to which Harless testified based on his conversation with a member of the Neighborhood Crips criminal street gang did not involve the Bloods in general, but instead involved the Inglewood Family Bloods criminal street gang in particular.

In another part of his testimony, Harless again referred to an alliance between the Hoover Criminals criminal street gang and the Bloods criminal street gang. This portion of Harless's testimony brings us to the second reason why we conclude Harless exaggerated his testimony about this supposed "loose alliance." Harless based this portion of his testimony on a conversation he had with a Bakersfield gang member. While such an alliance may exist in Bakersfield, the statement of a Bakersfield gang member cannot support an inference, conclusion, or opinion that such an alliance also exists in Los Angeles between different criminal street gangs.

Finally, we note Harless's opinion was directly contradicted by Tripp, who testified that he was not aware of any such alliance. Tripp, an experienced police officer working in the home town of the Neighborhood Piru criminal street gang, had had numerous contacts with a member of that gang on a weekly basis. Tripp's opinion was formed by these numerous contacts, as well as his constant review of police reports filed by the Inglewood Police Department. Harless, on the other hand, had no experience with any Los Angeles criminal street gang. Obviously, the material underlying Harless's opinion on this issue was not reliable and was not the type of material on which a competent expert would rely.

Another difficulty with Harless's testimony is that, even if we were to assume there was a loose alliance between some criminal street gangs, Harless's general testimony did not support a more specific inference that there was a loose alliance between the 94 Hoover Criminals and the Neighborhood Piru criminal street gangs, an inference on which the prosecution relied. Moreover, it would be unwise to make this inference when Tripp, the prosecution's expert witness, who, as we have explained, had far more experience with Los Angeles gangs than Harless, directly contradicted the existence of such an alliance. It is clear Harless's opinion that there existed a loose alliance between the 94 Hoover Criminals and Neighborhood Piru criminal street gangs was unsupported by any evidence, let alone substantial evidence.

16.

We acknowledge that Harless did not specifically testify a loose alliance existed between the 94 Hoover Criminals and Neighborhood Piru criminal street gangs. Such an assertion, however, was implicit in Harless's answer to the hypothetical question, discussed below, which provided the only evidence to support the section 186.22, subdivision (b) enhancement.

The loose alliance between the 94 Hoover Criminals and the Neighborhood Piru criminal street gangs formed the basis for Harless's testimony about the section 186.22, subdivision (b) enhancement. That no such alliance existed undermines the remainder of Harless's testimony on the issue. Nonetheless, we proceed to the hypothetical question that provided the only evidence to support the enhancement.

In response to the prosecution's hypothetical question, Harless opined the crime benefited the "Blood and Hoover" criminal street gangs because of this loose alliance. Although it is difficult to follow his reasoning, it appears Harless believed that because of this loose alliance the two perpetrators of the hypothetical crime were permitted to commit crimes together, thereby strengthening the alliance. Because, as we have demonstrated, there was no credible evidence of a loose alliance between the Neighborhood Piru and the 94 Hoover Criminals criminal street gangs, there is no foundation for the opinion that it was permissible for these two gang members to commit this robbery together. It also was impossible to strengthen an alliance that did not exist. Like the proverbial house built on sand (*Gardeley, supra,* 14 Cal.4th at p. 618), the lack of foundation for Harless's opinion causes the remainder of his conclusions to crumble.

Harless also opined there would be a benefit to the criminal street gangs because the gang and the gang members would earn respect in the gang culture from using violence. Once again, there are no facts to support the theory. This crime was committed in Bakersfield. Lyons and Rector were members of Los Angeles criminal street gangs. No witness testified that either Lyons or Rector ever identified himself as a gang member

or made any assertion the crime was related to a criminal street gang. Instead, Zamora testified he did not know the two perpetrators were gang members.

Thus, it is pure speculation to suggest that somehow knowledge of the crime would be transferred to Los Angeles and somehow gang members would know the crime was committed by gang members in general—and Lyons and Rector in particular. Indeed, it would appear the only way this type of information could be relayed to Los Angeles was if Lyons and/or Rector informed other gang members of their exploits. While undoubtedly such communication could occur, to suggest it would do so in this case is pure speculation. The speculative nature of Harless's testimony is obvious since Lyons and Rector did not commit the crime in Los Angeles, never identified themselves as gang members, and had a strong motive (avoiding detection and embarrassment) for not telling anyone they had failed to rob a taxicab driver, even though they were armed and he was not.

Harless further opined the crime was committed for the benefit of the criminal street gang because the criminal street gang would benefit financially from a successful robbery. Once again, there is no factual support for this assertion. Harless was speculating that if the robbery was successful, then Lyons and/or Rector would have shared the proceeds of the robbery with one or both of the gangs. There is no evidence in the record to support this theory, and, considering the crime was committed in Bakersfield, it seems likely that neither knowledge about nor the proceeds from the robbery would have been shared with anyone in Los Angeles. In fact, the prosecution theorized that Lyons needed the money from the robbery to buy a bus ticket to Los Angeles so he could meet with his parole officer. That Lyons needed the money for a personal reason militates against the theory he would have shared the proceeds with the gang, especially since he had no way of knowing how much would be obtained in a successful robbery.

Harless also opined the crime would benefit a criminal street gang because it would permit Lyons to make a meeting with his parole officer and thus remain out of custody and available to perform gang-related tasks. This opinion ignores one fact. Lyons was staying in Bakersfield, and the 94 Hoover Criminals criminal street gang is based in Los Angeles. While Harless testified some members of the Hoover Criminals criminal street gang moved to Bakersfield (not necessarily members of the 94 Hoover Criminals criminal street gang), there was no evidence to suggest that Lyons had any contact with these other gang members. It is clear the 94 Hoover Criminals criminal street gang would not benefit if Lyons lived in Bakersfield. And to suggest he was going to return to live in Los Angeles, or was starting a "branch" gang in Bakersfield, is pure speculation. Nothing in the record supports either assertion.

Nor was there substantial evidence the crime was committed in association with a criminal street gang. There was substantial evidence to support the jury's conclusion that Lyons and Rector committed the robbery together. Nothing more than Harless's speculation, however, supported the jury's finding that the crime was committed in association with a criminal street gang. It appears Harless opined the crime was committed in association with a criminal street gang because of the loose alliance discussed above and the strengthening of the alliance as a result of the commission of a violent crime. Since there was no credible evidence of an alliance, Harless's opinion was conjecture and not substantial evidence.

Nor was there any other evidence in the record to support the prosecution's theory that the crime was committed in association with a criminal street gang. The prosecutor argued in closing remarks that the jury must find the crime was committed in association with a criminal street gang because both Lyons and Rector were gang members. This argument, however, misconstrues the statute, which requires the crime be committed in association with *any criminal street gang*, not other members of any criminal street gang. (§ 186.22, subd. (b).) While many crimes charging a section 186.22, subdivision (b)

19.

enhancement involve more than one member from the same criminal street gang, this crime was committed by two perpetrators who belonged to different criminal street gangs. This distinction required the prosecution to present evidence that the crime was committed in association with either the 94 Hoover Criminals or Neighborhood Piru criminal street gangs. Since the prosecution's only evidence on this issue was the speculation of Harless, the prosecution failed to carry its burden of proof.

Both Harless and Tripp acknowledged that simply because a crime is committed by gang members does not mean the crime is gang related. This concession means that there must be some evidence tying the crime to a gang other than the mere commission of the crime. The only evidence in the record to support the theory that this crime was committed in association with or for the benefit of any criminal street gang was Harless's opinion. Harless's opinion was ill-informed and speculative and thus was not substantial evidence to support the enhancement. Accordingly, the true finding that the crime was committed within the meaning of the section 186.22, subdivision (b) enhancement must be vacated.

### Neighborhood Piru Criminal Street Gang

Rector, in an argument joined by Lyons, contends there was insufficient evidence to establish that the Neighborhood Piru was a criminal street gang within the meaning of section 186.22. Two subdivisions of this section define a criminal street gang. Subdivision (f) defines a criminal street gang as (1) "any ongoing organization, association, or group of three or more persons, whether formal or informal," (2) "having as one of its primary activities the commission of one or more of the criminal acts [listed in subdivision (e)]," (3) "having a common name or common identifying sign or symbol," and (4) "whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Subdivision (e) defines a pattern of criminal gang activity as "the commission of, attempted commission of, conspiracy to commit, or solicitation of … or conviction of two or more of the following offenses, provided at least

20.

one of these offenses occurred after the effective date of the chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons .…"

The prosecution was required to establish each of these four elements to support the conviction for active participation in a criminal street gang.[5]  Defendants argue that the evidence presented by the prosecution did not establish the primary activity of either the 94 Hoover Criminals or the Neighborhood Piru criminal street gang was one or more of the listed crimes.  Once again, we turn to the testimony of the expert witnesses to resolve this issue.

Tripp testified the Neighborhood Piru criminal street gang committed murders, shootings, drive-by shootings, robberies, narcotics possession and transportation, and deadly weapons possession and transportation.  He also testified about two predicate offenses -- one involving a murder and robbery conviction by a member of the Neighborhood Piru criminal street gang and the second involving a murder conviction by a different member of the Neighborhood Piru criminal street gang.

This evidence is inadequate to establish that the Neighborhood Piru group meets the statutory requirements of a criminal street gang.  Tripp provided the only information presented by the prosecution to establish that the Neighborhood Piru group was a criminal street gang.  Tripp testified that the Neighborhood Piru members admitted committing various offenses.  Tripp also testified to two crimes intended to be the predicate offenses for the group, which were two murders.  Tripp *did not* testify that any of these crimes was one of the primary activities of the group.

The People appear to make two arguments to overcome the absence of evidence.

---

[5]The prosecution also was required to prove these elements to support the section 186.22, subdivision (b) enhancement.  We have concluded, however, that there was not substantial evidence to support the true finding on this enhancement for unrelated reasons.

First, the People point to the predicate crimes and the testimony about other crimes committed by members of the Neighborhood Piru group and suggest we should infer that these were primary activities of the Neighborhood Piru group. Section 186.22, subdivision (f) specifically states that a group is a criminal street gang only if the group's members commit "as one of its primary activities" the commission of the enumerated criminal acts. That some members of the group commit the enumerated acts does not establish or permit an inference that committing these crimes is one of the primary activities of the group. From this record, we do not know if the identified crimes occurred only occasionally, regularly, or on a single occasion. The inference suggested by the People would be based on speculation.

Second, the People refer to a statement made by Harless that selling cocaine base is one of the primary activities of both the Hoover Criminals and the Bloods. This statement was far too vague to meet the People's burden of proving beyond a reasonable doubt that one of the Neighborhood Piru's primary activities is selling cocaine base. The record reflects that Harless was referring to a gang member in Bakersfield who apparently was a member of both the Hoover Criminals and some other criminal street gang that was affiliated with the Bloods criminal gangs when he made the comment. The Neighborhood Piru group is from Inglewood, not Bakersfield, and there was no evidence to suggest this group had a presence in Kern County.

Also, Tripp and Harless testified there is no criminal street gang called the Bloods, but instead there are many different gangs that fall within the "Blood" umbrella. To suggest that Harless's offhand comment about the primary activity of some unidentified Bloods-related criminal street gang was proof beyond a reasonable doubt of the primary activities of the Neighborhood Piru group is unreasonable. Harless's generalizations were insufficient to establish proof beyond a reasonable doubt. Simply stated, the prosecution failed to elicit evidence about this element of its case. This failure precludes

22.

any conviction based on the assertion that the Neighborhood Piru group was a criminal street gang, including Rector's conviction for participation in a criminal street gang.

Harless also testified about the Hoover Criminals criminal street gang. He testified the primary activities of the Hoover Criminals criminal street gang were various crimes that are enumerated in section 186.22, subdivision (e). He identified two predicate offenses for the Hoover Criminals criminal street gang. The first occurred on August 22, 2009, and involved an arrest of a Hoover Criminals gang member for possession of cocaine base for sale. Harless described this as a primary activity "of the Hoovers and the Bloods." The second occurred on September 8, 2007, and involved a grand theft by a Hoover Criminals gang member in the presence of two members of a Bloods gang. Harless testified the primary activity of the Hoover Criminals criminal street gang was murder, robbery, theft-related crimes, weapons possession, and narcotic sales. A third crime occurred on February 28, 2009, where a member of the Hoover Criminals criminal street gang was convicted of murder and attempted murder. A fourth crime occurred on July 2, 2009, where a member of the Hoover Criminals criminal street gang was convicted of assault with a deadly weapon in a gang-related shooting. Thus, there was testimony about each of the section 186.22, subdivision (f) elements.

Defendants argue that Harless failed to establish the foundation for his testimony and assert his testimony was directed at the Kern County Hoover Criminals criminal street gang, not the 94 Hoover Criminals criminal street gang from Los Angeles.

Harless testified about his training and experience and his contacts (five to 10) with members of the Hoover Criminals criminal street gang in Kern County. Harless explained the Hoover Criminals criminal street gang originated in Los Angeles and migrated to Bakersfield. He testified to contacts he had in Kern County with members of the Hoover Criminals criminal street gang, in particular two separate contacts wherein a member of the gang provided information about the gang. He also discussed crimes

committed by other members of the Hoover Criminals criminal street gang, some in Kern County and others in the Los Angeles area.

While Harless lacked the experience of most gang officers, and, in particular, any significant experience with the Los Angeles-based gangs, we conclude his limited Kern County contacts with members of the Hoover Criminals criminal street gang provided the minimum qualifications to opine on the Hoover Criminals criminal street gang in this case. Moreover, because the record does not demonstrate the Hoover Criminals criminal street gang in Kern County is a separate criminal street gang from the Hoover Criminals criminal street gangs in Los Angeles, Harless's qualifications extend to the 94 Hoover Criminals criminal street gang located in Los Angeles.

Because Harless was minimally qualified, and there was a minimal foundation for his opinions, there was sufficient evidence to establish the 94 Hoover Criminals criminal street gang met the requirements of section 186.22, subdivision (f).

### *Denial of Motion to Bifurcate*

Prior to trial, the trial court denied defendants' motion to bifurcate all of the gang-related charges and enhancements from the shooting related crimes. Defendants argued the gang evidence in this case was so weak, and gang evidence in general was so prejudicial, that the gang-related issues should be bifurcated. Defendants contend the trial court erred in denying the motion.[6]

Section 954 permits the trial court to bifurcate different offenses or counts if required by the interests of justice. A trial court has discretion when ruling on such a motion (§ 954), and on appeal an abuse of discretion must be demonstrated. (*People v. Thomas* (2012) 53 Cal.4th 771, 798.) "In order to establish an abuse of discretion, defendant must make a 'clear showing of prejudice.' [Citation.]" (*Ibid.*)

---

[6]The People argue defendants should have made a motion to sever the charges, and not a motion to bifurcate. We need not address this question to resolve this issue.

It is unnecessary to address the question of whether the motion should have been granted because, even if we were to assume the trial court ruled incorrectly, defendants cannot establish they suffered any prejudice. Defendants argue the inherent prejudice that occurred when they were accused of being gang members resulted in their convictions. We disagree.

The evidence unequivocally established that Zamora was shot by a firearm and seriously wounded during an attempted robbery. Zamora consistently told police that he picked up the perpetrators at the casino and they demanded his money. When he refused they threatened to kill him, and when he continued to refuse one of the perpetrators shot him. That the perpetrators were armed with a firearm and threatened to kill Zamora overwhelmingly suggests the perpetrators intended to kill the victim. Accordingly, the only issue was the identity of the perpetrators.

The evidence of identity was very strong. The victim identified both defendants at trial. It is true that before trial the victim was not able to identify either defendant in a photo lineup, and he made statements to the police indicating it was dark and he might not be able to identify the perpetrators. Defendants, however, were identified by a security guard from the casino, on video surveillance from the casino, and Lyons's head wrap was located at the scene of the shooting. Moreover, Rector's appearance was very distinctive because a portion of his hair was white.

Because the evidence that defendants were the perpetrators of the shooting was overwhelming, defendants cannot establish any prejudice as a result of the trial court's denial of their motion to bifurcate the gang crimes and enhancements.

## II. Rector's Remaining Arguments

### *Insufficient Evidence Rector Shot the Victim*

Rector claims there was insufficient evidence he was the perpetrator who shot the victim. This argument is based on the premise that Zamora's trial testimony was equivocal and thus did not constitute substantial evidence.

25.

Rector is correct that Zamora's trial testimony was equivocal. Zamora initially described the perpetrators as two Black men in their mid-20's. He then identified Rector and Lyons as the two perpetrators. Zamora testified that Rector was sitting in the rear seat behind the driver and gave directions to their destination. Zamora testified Rector demanded his money and then shot him when he refused the demand. Shortly thereafter, the trial court attempted to clarify a portion of Zamora's testimony by asking who had shot him, and Zamora responded, "Exactly, I don't remember. Exactly, I don't remember. I think, but I don't remember exactly." The prosecutor next asked if any money was taken that night, and Zamora replied "The truth is I don't know because I didn't even know what happened."

On cross-examination Zamora testified that he would "like to say that [he] remember[ed] everything" that happened that night, although a few minutes later Zamora admitted he did not remember everything. He later testified that he thought his memory was a little better at trial rather than when the incident occurred.

Police officers testified that shortly after the shooting Zamora was shown a photo lineup that included both Rector and Lyons. Zamora was not able to identify either defendant.

While this testimony was inconclusive, Zamora's trial testimony was not the only evidence identifying Rector as the shooter. A recording of an interview (the second interview) between Zamora and investigating officers was played for the jury. In this interview, Zamora described one of the perpetrators as having two colors in his hair. Lyons was wearing a head covering at the time, so the person who had two colors in his hair was Rector. Zamora also told officers that one of the perpetrators was a little taller than the other perpetrator. Other evidence established that Rector was several inches taller than Lyons. This distinction is important because Zamora repeatedly referred to one of the two perpetrators as the taller man in this interview.

26.

Zamora told officers that the taller man (Rector) did most of the talking in the taxicab. When they arrived at the destination, Rector and Zamora got out of the taxicab. That is when Rector demanded Zamora's money. Rector shot Zamora after Zamora refused to give him any money. Defense counsel was able to dissect the recorded interview and create some ambiguity as to whether it was the taller or shorter perpetrator who shot Zamora, although it would appear Zamora was referring to the taller perpetrator.

The final piece of evidence identifying Rector as the perpetrator who shot Zamora was found in another interview (the first interview) between officers and Zamora, which was not recorded. The same officer conducted both interviews and clarified that in the first interview Zamora identified the shooter as the taller of the two perpetrators.

While Zamora's trial testimony was not sufficient evidence to find Rector was the perpetrator who shot Zamora, we review the entire record to determine if substantial evidence supports the finding. The information provided by Zamora in his two statements to the police provided evidence that was reasonable, credible, and of solid value to support the jury's finding. The record establishes that Rector was taller than Lyons, and the shooter was described as the taller of the two individuals. This information, when combined with the security footage from the casino, and Rector's distinctive hairstyle, provided substantial evidence that Rector shot Zamora.

### Lesser Included Offense

Rector's final argument is that his conviction for active participation in a criminal street gang (§ 186.22, subd. (a), count 4) is a lesser included offense to his conviction for carrying a firearm while an active participant in a criminal street gang (former § 12031, subd. (a)(2)(C), count 6). The People concede that two cases compel this result -- *People v. Robles* (2000) 23 Cal.4th 1106, 1115 [to prove a violation of former § 12031, subd. (a)(2)(C) People had to prove violation of § 186.22, subd. (a)] and *People v. Flores* (2005) 129 Cal.App.4th 174, 184 [violation of § 186.22, subd. (a) necessarily included in

27.

a former § 12031, subd. (a)(2)(C) conviction].  Accordingly, the conviction for violating section 186.22, subdivision (a) must be reversed.[7]

## DISPOSITION

The jury's finding that the crime was committed in violation of section 186.22, subdivision (b)(1), as alleged in count 1 (attempted murder), count 2 (aggravated mayhem), and count 3 (attempted second degree robbery), is vacated.  Rector's conviction for active participation in a criminal street gang is reversed.  The jury's finding that Lyons violated section 12022.53, subdivisions (d) and (e)(1) is vacated.  The judgment is otherwise affirmed.  The matter is remanded to the trial court for resentencing of Lyons and to prepare new abstracts of judgment.[8]

_____
CORNELL, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.

_____

[7]This conclusion also is compelled by the prosecution's failure to prove all of the elements to establish that the Neighborhood Piru group was a criminal street gang within the meaning of section 186.22.

[8]We also note the abstracts of judgment for Rector and Lyons incorrectly state defendants were convicted of first degree robbery.  The jury found each defendant guilty of second degree robbery.  This error also should be corrected in the trial court.